WARNICKE & LITTLER, P.L.C.
1411 N. Third Street
Phoenix, Arizona 85004
TELEPHONE (602) 256-0400
FAX (602) 256-0345
E-MAIL: administrator@warnickelittler.com
Ronald E. Warnicke/SBN 001791
Thomas E. Littler/SBN 006917
Robert C. Warnicke/SBN 015345
Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>JB'S FAMILY RESTAURANTS, INC., a Delaware corporation,<br><br>　　　　　　　　Debtor. | No.  02-03349-ECF-CGC<br><br>Chapter 11 |

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S PLAN OF REORGANIZATION**

**TABLE OF CONTENTS**

......................................................................................................................................................... Page

I. INTRODUCTION ........................................................................................................................ 1

    A.     Definitions ....................................................................................................... 1

    B.     Purpose of the Disclosure Statement ............................................................... 1

    C.     Importance to Creditors To Read This Disclosure Statement ........................... 1

    D.     Order Governing the Plan Confirmation Process ............................................. 1

II. EXECUTIVE SUMMARY OF THE PLAN ................................................................................. 1

III REPRESENTATION ................................................................................................................ 2

    A.     Other Representations Not Authorized ............................................................. 2

    B.     Representations Not Subject To Audit Other Representations Not Authorized ............................................... 2

    C.     Source And Date Of Representations ................................................................ 2

    D.     Intended Use Of Disclosure Statement ............................................................ 2

    E.     Debtor's Recommendation To Accept Plan ...................................................... 3

    F.     Disclaimer ....................................................................................................... 3

IV       HISTORY AND BACKGROUND OF THE DEBTORS ...................................................... 4

    A.     History of the Debtor ....................................................................................... 4

    B.     Overview of Business Operations .................................................................... 4

         1.   General .................................................................................................. 4

         2.   Competition .......................................................................................... 5

         3.   Franchising ........................................................................................... 5

         4.   Trademarks and Service Marks .............................................................. 5

         5.   Employees ............................................................................................ 5

         6.   Properties .............................................................................................. 5

         7.   Management & Employment Agreements ............................................... 6

         8.   Ownership ............................................................................................ 7

         9.   Historical Operating Information ........................................................... 7

          10.  Turnaround in Financial Performance ..................................................................... 7

C.      Litigation ........................................................................................................................ 7

D.      Events Preceding the Chapter 11 Filing ......................................................................... 8

V      COMMENCEMENT OF AND SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE ....................... 8

A.      Commencement of the Chapter 11 Case ........................................................................ 8

B.      First Day Motions .......................................................................................................... 8

C.      Engagement of Professionals ......................................................................................... 8

D.      Cash Collateral Order .................................................................................................... 8

E.      Creditors Committee ...................................................................................................... 9

F.      Lease Rejections and Assumptions ................................................................................ 9

G.      Sales of Real Property .................................................................................................... 9

H.      Personal Property Related to Closed Stores .................................................................. 9

I.      Bar Date ......................................................................................................................... 9

VI      SUMMARY OF THE PLAN ........................................................................................................ 9

A.      Payment of Administrative Expenses and Priority Claims ............................................ 9

B.      Classification of Claims and Interests .......................................................................... 10

C.      Distributions to Creditors ............................................................................................ 12

D.      Settlement Fund and Election by Unsecured Creditors to Participate .......................... 12

E.      Creation of Settlement Fund ......................................................................................... 12

F.      Executory Contracts ..................................................................................................... 12

VII      VOTING ON THE PLAN .......................................................................................................... 13

A.      Who May Vote .............................................................................................................. 13

B.      Voting Procedures ........................................................................................................ 14

C.      Voting Deadline............................................................................................................. 15

D.      Vote Required for Class Acceptance ............................................................................ 15

E.      Fiduciaries and Other Representatives ......................................................................... 15

F.      Defects and Irregularities ............................................................................................. 15

G.      Withdraw of Ballots: Revocation ................................................................................. 15

H.     Further Information .......................................................................................................... 16

VIII   CONFIRMATION OF THE PLAN ............................................................................................. 16

A.     Confirmation Hearing .................................................................................................... 16

B.     Objections to Confirmation of the Plan ......................................................................... 16

C.     Requirements for Confirmation of the Plan ................................................................... 16

D.     Feasibility of the Plan .................................................................................................... 17

E.     Confirmation without Acceptance of All Impaired Classes "Cramdown" ..................... 18

F.     Alternatives to Confirmation and Consummation of the Plan ........................................ 18

     1.     Continued Operations and Delay in the Process ............................................... 18

     2.     Alternative Plans .............................................................................................. 19

     3.     Liquidation Under Chapter 7/ Best Interest Test .............................................. 19

G.     Modifications and Amendments ..................................................................................... 20

H.     Effects of Confirmation ................................................................................................. 20

     1.     Binding Effect .................................................................................................. 20

     2.     Permanent Injunction ....................................................................................... 21

     3.     Exculpation and Limitation on Liability ........................................................... 21

IX     CERTAIN RISK FACTORS RELATING TO THE PLAN ....................................................... 21

A.     Failure to Confirm the Plan ............................................................................................ 21

B.     Failure to Consummate the Plan ..................................................................................... 21

X     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................... 22

A.     Federal Income Tax Consequences to the Debtor .......................................................... 22

B.     Federal Income Tax Consequences to the Holders of Claims .......................................... 22

XI.     RECCOMENDATION AND CONCLUSION ............................................................................ 22

EXHIBITS TO THE PLAN

EXHIBIT A—Plan of Reorganization Propounded by Debtor

EXHIBIT B—List of Executory Contracts showing those that have been assumed, rejected , and will be rejected by the Confirmation Order.

EXHIBIT C—List of Restaurant Locations including locations closed post petition

EXHIBIT D—PrePetition Financial Statements

EXHIBIT E—Debtor's Five Year Projection of Revenues, Expenses & Income.

EXHIBIT F.   List of Claims For Classes 1, 2 and 7

EXHIBIT G   Debtor's Liquidation Analysis

# I
## INTRODUCTION

JB's, as debtor and debtor in possession in the above-encaptioned chapter 11 reorganization case, are furnishing this Disclosure Statement and the Exhibits hereto, the accompanying Ballots and the related materials delivered herewith pursuant to Section 1126(b) of the Bankruptcy Code, in connection with its solicitation of acceptances of the proposed Plan of Reorganization described herein and annexed hereto as Exhibit A. JB's is soliciting acceptances of its Plan from certain Claimants who are entitled to vote on the Plan pursuant to Section 1126 of the Bankruptcy Code.

## A. Definitions

All capitalized terms not otherwise described in this Disclosure Statement have the meanings ascribed to them in Appendix A to the Plan which is attached hereto as Exhibit A.

## B. Purpose of the Disclosure Statement

The Debtors are furnishing this Disclosure Statement to all impaired creditors who are entitled to vote to accept or reject the Plan. The Disclosure Statement is to be used by each such creditor solely in connection with its evaluation of the Plan. Use of the Disclosure Statement for any other purpose is not authorized. The purpose of the Disclosure Statement is to provide "adequate information" as that term is defined in Section 1125 of the Bankruptcy Code, to enable Creditors whose Claims are impaired under the Plan to make an informed decision regarding whether to accept or reject the Plan.

## C. Importance to Creditors To Read This Disclosure Statement

**YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE PLAN, BUT THE PLAN ITSELF WILL BE THE GOVERNING DOCUMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.**

## D. Order Governing the Plan Confirmation Process

On July __, 2002, the Bankruptcy Court entered its order (1) approving this Disclosure Statement as containing "adequate information" pursuant to Section 1125 of the Bankruptcy Code, (2) fixing _____ as the deadline for filing and serving any objections to Confirmation of the Plan, (3) fixing _____ as the deadline for voting to accept or reject the Plan, and (4) setting _____ as the date and time to begin a hearing on the Confirmation of the Plan.

# II
## EXECUTIVE SUMMARY OF THE PLAN

The following summary of the Plan is provided for the convenience of the reader to provide an overview of the Plan provisions. This summary is qualified and should be read in conjunction with the more detailed information and financial statements and notes appearing elsewhere in this Disclosure Statement.

JB's owns, operates and franchises "coffee shop" style restaurants in six western states. JB's was started in 1961 as a single Big Boy franchise in Provo, Utah. JB's expanded to several Big Boy restaurants in the western United States In 1987 JB's terminated its franchise relationship with Big Boy and commenced operating and franchising its own concept of coffee shop dining. JB's was owned by Santa Barbara Restaurant Group. In November, 2000, Santa Barbara sold JB's to its current shareholder which is owned by JB's top management. At the time of the acquisition JB's owned the real estate of only about a quarter of the restaurants it was operating and was burdened by expensive leases impairing profitability for a large number of the unowned units. Burdensome leases and higher than necessary operating expenses impaired the profitability of a substantial number of the restaurants operated by the company. After its acquisition by management JB's

closed a number of unprofitable units through lease terminations, instituted cost cutting measures to reduce operating expenses, and implemented other measures to improve profitability. JB's was pursuing its plan to close money losing operations and reduce operating expenses when revenues were impaired by a general reduction in business following the events of September 11. This led to the filing of the Chapter 11.

JB's is now proposing a Plan to pay its creditors one hundred percent of its debt over a period of time. JB's may also offer those Claimants who would rather settle their Claims for a reduced amount now instead of waiting for payments over a period of years, the opportunity to elect to get paid immediately from a Settlement Fund .

The Plan provides for the payment of the secured debt according to the terms of the secured obligations, the payment of Administrative Expenses, Priority Tax Claims, and Priority Claims on the Effective Date of the Plan, the payment of the Executive Retirement Plan from the Effective Date forward according to its terms along with payment for the past due amounts over two years, and the payment to Unsecured Creditors the full amount of their allowed claims over a period of five years in quarterly payments from revenues from operations.

The Plan also provides that Debtor may create and fund of a Settlement Fund of $2,500,000.00 from which Unsecured Creditors may elect to participate. If an Unsecured Creditor elects to participate in the Settlement Fund, it will receive a payment of its pro-rata share of the remaining amounts in the Fund after the payment of Administrative Expenses, Administrative Convenience Class, and Priority Claims, as the full payment of their Unsecured Claim. The amount that an Unsecured Creditor will receive from the Settlement Fund for its Allowed Claim depends on the number of Unsecured Creditors and the size of their Unsecured Claims that make the election. The Debtor estimates that the payments could range from fifty percent or less to full payment of the Allowed Claims.

## III
## REPRESENTATIONS

**A.     Other Representations Not Authorized**.

No representations or other statements concerning the Debtor (particularly as to its future business operations or the value of its assets) are authorized by Debtor other than those expressly set forth in this Disclosure Statement. You should not rely upon any representations or inducements made to secure your acceptance of the Plan other than those set forth in this Disclosure Statement.

**B.     Representations Not Subject To Audit**.

The information contained herein has been prepared by the Debtor in good faith, based upon information available to the Debtor and its counsel. None of the information herein concerning the Plan has been subject to a verified audit.

**C.     Source And Date Of Representations**.

Debtor's management provided the factual information for this disclosure statement. Debtor believes that the statements contained in this Disclosure Statement are accurate as of the date hereof unless another time is specified. The facts, statements and representations herein may be altered by events and circumstances occurring after the date of this Disclosure Statement. Delivery of this Disclosure Statement should not be construed as implying that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

**D.     Intended Use Of Disclosure Statement**.

This Disclosure Statement is intended for the sole use of Creditors and other parties-in-interest and for the sole purpose of assisting them in making an informed decision about the Plan. This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained in it shall

constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtor or any other party or be deemed conclusive advice on the tax or other legal effects of the reorganization of holders of Claims or interests.

**E.    Debtor's Recommendation To Accept Plan**.

 THE DEBTOR STRONGLY URGES EACH CREDITOR TO <u>VOTE TO "ACCEPT" THE DEBTOR'S PLAN</u>. DEBTOR BELIEVES THAT UPON EVALUATION OF THE PLAN, EACH PERSON OR ENTITY ENTITLED TO VOTE WILL CONCLUDE THAT THE DEBTOR'S PLAN IS FAIR AND REASONABLE TO ALL THE CREDITORS OF THE ESTATE.  CREDITORS WHO HAVE QUESTIONS REGARDING THE CONTENTS OF THIS DISCLOSURE STATEMENT OR THE DEBTOR'S PLAN MAY CONTACT THOMAS E. LITTLER, ATTORNEY FOR THE DEBTOR AT (602) 256-0400.

**F.    Disclaimer**

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES <u>NEITHER A CERTIFICATION</u> THAT THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE <u>NOR AN ENDORSEMENT</u> OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PROMULGATED BY THE PROPONENT IN AN EFFORT TO SOLICIT CREDITORS AND EQUITY INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN.  THE SOLICITATION IS A SOLICITATION BY THE PROPONENT ONLY.   IT IS NOT A SOLICITATION BY THE ATTORNEYS OR ACCOUNTANTS, AND THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE PROPONENET AND NOT OF THE DEBTOR'S ATTORNEYS OR ACCOUNTANTS.

CERTAIN MATERIALS CONTAINED IN THIS DISCLOSURE STATEMENT ARE TAKEN DIRECTLY FROM OTHER, READILY ACCESSIBLE DOCUMENTS OR ARE DIGESTS OF DOCUMENTS. WHILE EFFORTS HAVE BEEN MADE TO CONVEY ACCURATELY THE CONTENTS OF SUCH DOCUMENTS, YOU ARE URGED TO EXAMINE THE DOCUMENTS THEMSELVES AND TO USE THE DESCRIPTIONS OF DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ONLY AFTER HAVING CONDUCTED SUCH AN EXAMINATION.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS FUTURE BUSINESS OPERATIONS, THE VALUE OF ITS PROPERTY, OR THE VALUE OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN, YOU SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT.   SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE PROPONENTS WHO, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

EFFORTS HAVE BEEN MADE TO PREPARE ALL UNAUDITED FINANCIAL STATEMENTS WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPALS.  HOWEVER, AS TO ALL FINANCIAL STATEMENTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE ACCURACY OF THE INFORMATION CONTAINED IN THOSE STATEMENTS TO BE WITHOUT ERROR.

THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN EXAMINATION BY INDEPENDENT, CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTOR HAS KEPT RECORDS SUBSEQUENT TO THE FILING OF THE PETITION COMMENCING THIS CASE AND THE DEBTOR HAS FILED MONTHLY FINANCIAL REPORTS WITH THE COURT SINCE THAT DATE.

THE LIQUIDATION ANALYSIS CONTAINED IN THIS DISCLOSURE STATEMENT WAS NEITHER COMPILED BY INDEPENDENT, CERTIFIED PUBLIC ACCOUNTANTS NOR SUBJECTED TO AN AUDIT OR EXAMINATION BY INDEPENDENT, CERTIFIED PUBLIC ACCOUNTANTS.

<u>IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU SHOULD DO SO</u>. UNDER THE BANKRUPTCY CODE, DETERMINING THE OUTCOME OF BALLOTING ON THE PLAN REQUIRES A CALCULATION WHICH CONSIDERS THE VOTES OF THOSE CREDITORS AND EQUITY INTEREST HOLDERS WHO ACTUALLY VOTED ON THE PLAN. YOUR RIGHTS MAY BE AFFECTED EVEN IF YOU DO NOT VOTE ON THE PLAN. YOUR OPPORTUNITY TO HAVE THE OUTCOME YOU DESIRE WILL LIKELY BE ENHANCED IF YOU VOTE.

NOTHING IN THIS DISCLOSURE STATEMENT LIMITS DEBTOR'S RIGHTS TO OBJECT TO ANY PROOFS OF CLAIMS OR INTERESTS FILED IN THIS CASE.

BECAUSE THE PROPONENT DOES NOT EXPRESS ANY OPINION AS TO THE TAX CONSEQUENCES OF THE PLAN, IN NO EVENT WILL THE DEBTOR, OR IT'S PROFESSIONAL ADVISORS THEY HAVE ENGAGED, BE LIABLE IF, FOR ANY REASON, THE TAX CONSEQUENCES OF THE PLAN ARE NOT AS ANTICIPATED BY CREDITORS AND EQUITY INTEREST HOLDERS. CREDITORS AND EQUITY INTEREST HOLDERS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF THE PLAN.


IV
HISTORY AND BACKGROUND OF THE DEBTORS

A.      History of the Debtor

JB's was founded in 1961 in Provo, Utah as a Big Boy Franchise with one location. As a Big Boy Franchise, JB's expanded to several locations operating coffee shops featuring the Big Boy menu. JB's terminated its franchise relationship with the Big Boy Franchise system in 1987, operated simply as JB's Family Restaurants. JB's then commenced franchising its own concept. Since 1987 JB's has been successfully operating and franchising its popular menu in its restaurants.

B.      Overview of Business Operations

1.      General

The Debtor owns, operates, and franchises a chain of restaurants under the tradename "JB's Family Restaurants" or simply "JB's." JB's offers a full service coffee shop style menu in its restaurants. The most popular time of day for its restaurants, consistent with its coffee shop concept, is the morning when breakfast is served. Many of its restaurants also offer a selection of beer and wine for the lunch and dinner hours. JB's offers a very popular buffet breakfast buffet in the morning that turns into a salad bar for lunch and dinner. JB's is open for extended hours to serve its customers.

## 2. Competition

The food service industry is highly competitive with respect to food quality, concept, location, service and price. There are many well-established food service competitors in the market some with substantial financial and other resources. JB's believes it competes directly with other coffee shops like Village Inn. It also competes with more upscale full menu restaurants like Coco's. The company also competes less directly with fast food operations, bagel stores, and coffee houses.

The Debtor believes that it competes favorably at the more value conscious level of the market. JB's offers the customer a full and varied menu at prices that compete favorably with its competition and also offers great value with its breakfast buffet and salad bars.

## 3. Franchising

JB's has entered into franchise agreements with persons who operate a total of 29 restaurant locations. Franchisee's pay a fee to JB's for the right to use the JB's name other proprietary information and to benefit from the buying power JB's negotiates for itself and its franchisees. JB's also supports its franchisees with advertising for which the franchisees pay a share of the total advertising expense. JB's also supports the franchisees with menu changes, management training, and supervision.

## 4. Trademarks and Service Marks

JB's owns a number of trademarks and service marks that have been registered with the United States Patent and Trademark Office, including JB's. JB's also has developed menus, and concepts that it considers proprietary and important to the success of its restaurant operations.

## 5. Employees

JB's employs approximately 1300 salaried and hourly employees. There are 10 home office employees located in Tempe, Arizona and three district managers. All the other employees work in the restaurants. All employees are paid bi-weekly through a payroll service.

## 6. Properties

When current management acquired ownership of JB's in November, 2000, it operated 54 restaurants many of which were subject to burdensome lease obligations that made the restaurants unprofitable. From November, 2000 to the Petition date, JB's reduced the number of restaurants that it operates directly to 34 closing twenty units.

As of the Petition Date, JB's Restaurants operated 34 restaurants it owned and directly operated in six western states of Arizona, New Mexico, Idaho, Utah, Wyoming and Montana and supported 29 franchised units. A list of the restaurant locations including those that have been closed since the Petition Date is attached hereto as Exhibit C.

During this Chapter 11 JB's has closed restaurants though expiration of leases according to the terms of the lease and through rejection of leases in accordance with section 363 of the Bankruptcy Code.

JB's has also sold some of its restaurants that were unprofitable and used the proceeds to reduce its secured indebtedness.

JB's also leases office space for its headquarters in Tempe, Arizona.

### 7. Management & Employment Agreements

**Lynn Whiteford**, *50,* President, and Chief Executive Officer, is responsible for operations, marketing, food and beverage, research and development, purchasing, human resources, and training. He is the Managing Member of LBW Investments, LLC as well as an Officer and Director. He has been Executive Vice President and Chief Operating Officer of JB's Restaurants, Inc. since April 1996. In addition, Mr. Whiteford assumed the role of Chief Operating Officer for Timber Lodge Steakhouse upon the formation of Santa Barbara Restaurant Group in September 1998. He was also Senior Vice President and an officer of Santa Barbara Restaurant Group. Mr. Whiteford was Vice President of Operations and Senior Vice President of Operations for Summit Family Restaurants (the predecessor of JB's) since August 1994. Prior to joining Summit, he was Director of Operations for the Ruby Restaurant Group from February 1992 until September 1994, and held various operations positions with Family Restaurants Inc. and its predecessors (Restaurant Enterprises Group, Grace Restaurant Company and Far West Services) from July 1977 through February 1992. He was a Regional Vice President from September 1987 through February 1992.

**William J. Boger**, *60,* Chief Financial and Administrative Officer is responsible for real estate site selection, restaurant design and development and assuring that the restaurants are maintained in good condition. Mr. Boger also oversees the accounting, financial analysis and lessor relations for the company. In addition, he is a Member of LBW Investments, LLC as well as an Officer and Director. Before joining the company in early 1998, Mr. Boger held similar key senior management positions during his 21 year tenure with the parent company of Coco's, Carrow's, El Torito, Chi Chi's and others. Mr. Boger graduated from Pace University in New York and obtained his CPA in New York and California.

**Terry L. Hornbaker**, *54,* joined JB's Restaurants, Inc. in November 1998 and has held various positions including Vice President of Operations, Vice President of Food and Beverage and Vice President of Research and Development. Mr. Hornbaker is also a Member of LBW Investments, LLC. From June 1995 through October 1998, he served as Chief Operating Officer and Director of Operations for Soupmasters, International in Baltimore, Maryland. From 1993 until 1995, he served as Western Regional Director with Buffets, Inc. out of Eden Prairie, Minnesota. From 1985 through 1993, he was Operations Vice President with Chi Chi's Mexican Restaurants out of Louisville, Kentucky. Additionally, from 1979 to 1985 he was Regional Vice President with W.R. Grace Restaurant Company.

**Julie Busskohl**, *44,* Vice President of Finance and Controller, responsible for producing daily, weekly and monthly sales reports. She produces a weekly P&L Statement by unit, district and concept. She is responsible for and coordinates all unit level/district level budgets, all financial analysis for Operations and Senior Management, administers bonus program for field operations, coordinates timely payment of field bonus program, and does variance reports for Operations of Period P&L's actual versus reported. In addition, she produce JB's/Galaxy menu mix, manages our capital expenditures data base, oversees the day to day operations of Payroll, Accounts Receivable and Accounts Payable. She also manages the franchise advertising co-op reconciliation and the franchise rebate reconciliation. Julie has been with the company since July 1998.

**Mona Kollmorgen**, *34,* Manager of Human Resources and provide administrative support for Lynn Whiteford and William Boger. Additionally, she is a Member of LBW Investments, LLC and an Officer and Director. She coordinates and administers all benefits programs and human resource functions. She develops and maintains all management handbooks, recipe manuals, training manuals and materials, and coordinates all corporate departments (Marketing, P.O.S., Operations, Purchasing) in any corporate programs rolled out, i.e. promotions, menus. She has been with JB's Family Restaurants, Inc. for 15 years with 1½ years in a unit as a hostess/server and has been the administrative assistant to the Division Vice President of Operations since the position was created.

All the above are considered to be key employees essential to the successful operation of the business operations and the successful reorganization of the Debtor. Debtor has entered into employment agreements with these key management employees. The Debtor shall seek the assumption of these contracts in the Confirmation Order.

**8.      Ownership**

Current management purchased JB's and Galaxy Diners from the Santa Barbara Restaurant Group in November 2000 through the acquisition of all the outstanding stock in JB's by LBW Investments LLC ("LBW"). LBW was formed by a management group from the JB's operations. LBW originally acquired 54 JB's Restaurants and 30 franchise units.

**9.      Historical Operating Information**

JB's prepares financial statements showing its revenue and expenses. As of December 27, 2001 the Debtor reported assets of $14,492,945.46 million and liabilities of $16,880,395.65 million. The Debtor reported $45,066,891.23 million in revenues for 2001 and generated a pretax income of negative $3,230,228.73 million. Attached as Exhibit D are the financial statements issued by the Debtor for the period ending on the Petition Date.

**10.     Turnaround in Financial Performance**

The company's performance has improved substantially since the Petition Date. This can be evaluated by comparing Exhibit to Exhibit which shows the pre filing financial performance of the Company to the Post Petition operations. While revenues have not yet fully recovered from those preceding September 11, they are continually moving upward. Most of the improvement in Post Petition financial performance has been the result of cost-cutting measures and the elimination of money losing units burdened with expensive lease obligations.

**C.      Litigation**

The following are lawsuits against JB's that were pending on the Petition Date:

1.   <u>Frank Munoz v. Summit Family Restaurants, Inc. dba JB's Restaurants</u>. This case involves issues of wrongful termination and defamation of character bought by former employee. JB's denies any liability. The matter has been stayed by the commencement of this Chapter 11 proceeding.

2.   <u>Equal Employment Opportunity Commission v. JB's Family Restaurants, Inc.</u> This case was brought by the EEOC representing a claim of twelve female employees that claim sex discrimination and sexual harassment. The EEOC seeks back pay and compensatory and punitive damages. JB's denies any liability. Trial is scheduled for April in 2004. It is likely that this case will proceed despite the stay. JB's has obtained authorization to retain its pre-petition law firm of Janove Barr Associates, L.C.

3.   <u>Pollard v. JB's Family Restaurants, Inc.</u> This case involves a general liability claim for a slip and fall accident at one of its restaurants. This claim is being handled by the Debtor's insurance company and Debtor believes the claim is fully covered by its insurance coverage.

Debtor also was a defendant to other lawsuits which were resolved or settled before the Petition Date. Some of those settlements involve interim payments and those persons entitled to payments are Class 7 Claimants.

**D.      Events Preceding the Chapter 11 Filing**

When current management purchased the company in November, 2000, the company was burdened with a number of properties that had substantial lease obligations that made those units, and unprofitable impairing the financial performance of the company.  The company also has certain Franchisees with substantial unpaid obligations to the company that also impaired the Pre Petition financial performance of the company.

Operating losses caused the company to fall behind in its trade payables.  Management was taking action to reduce operating expenses of the company and to close unprofitable operations with burdensome leases.  Then, after September 11, the company, like many businesses in the hospitality industry, suffered a general decline in revenues of approximately 5%.  This caused the company to fall further behind in the payment of trade payables.

Debtor was also unable to negotiate the termination of the burdensome leases without substantial cost.  Reorganization under Chapter 11 limits the Claims of Landlords on prematurely terminated leases.  These two factors, in the opinion of company management, made reorganization under Chapter 11 the only reasonable means of improving financial performance and paying company debt.

## V
## COMMENCEMENT OF AND SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

**A.      Commencement of the Chapter 11 Case**

The Debtor filed voluntary petitions in this Court for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. sec. 101-1330, on March 7, 2002.

**B.      First Day Motions**

On March 8, 2002, the Debtors obtained numerous "first day" orders to ease the administrative burden that arise in a chapter 11 case and to avoid damage to the company's operations.  These orders authorized the Debtors to: (i) pay prepetition wages and other amounts owing to employees, (ii) continue to utilize the company's existing bank accounts and cash management system and forms, (iii) authorizing the employment of counsel for the Debtor, (iv) establishing notice and motion procedures, (v) prohibiting utilities from terminating service on account of Prepetition debt, and (vi) allowing the company to honor Prepetition gift certificates.  Debtor believes these orders minimized the disruption to its operations associated with the commencement of bankruptcy proceedings, avoided injury to its employees and the possible damage to the company's work force, and allowed the company to maintain good relations with its customers.

**C.      Engagement of Professionals**

The Bankruptcy Court authorized the Debtor to retain Warnicke & Littler PLC as its attorneys on a general retainer to provide services and to assist the Debtor in reorganizing under Chapter 11.

**D.      Cash Collateral Order**

The Court authorized the use of Cash Collateral on an interim basis on March 8, 2002 based upon a stipulated order with Textron Financial Corporation which held a first position security interest in the Debtor's cash collateral as that term is defined by section 363 of the Bankruptcy Code.  The Order was subject to notice and subsequent objection by the Creditor's Committee and other Creditors and parties in interest.  When, after notice and further hearing, no objections were filed, the cash collateral order was made a final order.

### E. Creditors Committee

The United States Trustee appointed an Official Committee of Unsecured Creditors in the Chapter 11 case. The Creditors Committee retained Carmichael and Powell as its counsel which firm was later approved by the Bankruptcy Court as an estate professional.

### F. Lease Rejections and Assumptions

As of the Petition Date the Debtors owned or leased 34 company restaurants. An important part of the Debtor's business restructuring was to close those stores that were losing money because of burdensome lease obligations. During the course of these proceedings, Debtor closed several leased units and rejected leases on those operations.

The Debtor also assumed the leases on the remaining other store leases for locations that were profitable or which management believed in their business judgment could be profitable in the foreseeable future.

### G. Sales of Real Property

During this Chapter 11 case, the Debtor, with the permission of the Bankruptcy Court, sold two properties: The sale of Unit #22 in Roy, Utah was sold for $595,000. The sale closed on May 17, 2002. The net proceeds of $548,048.23 were wired to Textron Financial Corporation to reduce JB's secured debt. Debtor's real estate in Casper, Wyoming was sold for $125,000.00. Net proceeds from that sale of $121,192.39 were wired to Textron Financial Corporation to educe JB's secured debt.

### H. Personal Property Related to Closed Stores

The Debtor owned personal property used in the closed stores, including fixtures, furniture, equipment, food and miscellaneous items. Debtor took what it could use at its other business locations and could be removed without substantial expense, and put it into other units. The personal property that was too expensive or burdensome to remove, was left at the leased premises and, with the consent of the Creditor holding a security interest in such personal property, was given to the lessor in some cases in exchange for a reduction of lease obligations.

### I. Bar Date

No date has been set by the for Unsecured Creditors to file proofs of Claims.

The Plan provides for different dates for the filing of proofs of claims for rejected Executory Contracts and for Administrative Expenses that arise from or relate to unpaid rent accruing after the Petition Date.

## VI
## SUMMARY OF THE PLAN

### A. Payment of Administrative Expenses and Priority Tax Claims

Administrative Expenses consist of the costs and expenses of administration of the Chapter 11 case. They include, but are not limited to, the cost of operating the Debtors' business since the Petition Date, the outstanding unpaid fees and expenses of the professionals retained by the Debtors and the Creditor's Committee as approved by the Court, and payments necessary to cure prepetition defaults on unexpired leases and Executory Contracts that are being assumed under the Plan. All payments to professionals in connection with the Bankruptcy case for compensation and reimbursement of expenses and all payments to reimburse expenses of the Creditor's Committee will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and are subject to approval by the Court as

being reasonable. Debtor estimates that the unpaid Administrative Expenses on the Effective Date will be $50,000.00.

The allowed amount of Administrative Expenses shall be paid on the later of: (1) the Effective Date; (2) ten days after an Order approving the Administrative Expense is entered if the Claim is one of a professional person employed under Sections 327 or 1103 of the Bankruptcy Code; (3) twenty days after the Claim becomes an Allowed Claim for all other Administrative Expenses; or (4) on the date an Administrative Expense becomes payable pursuant to any agreement between the Debtor and the holder of such Administrative Expense.

Priority Tax Claims are those tax Claims entitled to priority pursuant to section 507 (a) (8) of the Bankruptcy Code. Priority Tax Claims are Unimpaired by the Plan. Each Allowed Priority Tax Claim shall be paid in full satisfaction, release, settlement, and discharge of the Claim on the later of: (1) the Effective Date; (2) twenty days after the Priority Tax Claim becomes an Allowed Claim; or (3) on the date the Priority Tax Claim becomes payable pursuant to any agreement between the Debtor and the holder of such claim. Payment of Allowed Priority Tax Claims shall be paid from the Settlement Fund prior to the payment of the Allowed Unsecured Claims.

Administrative Expenses and Priority Tax Claims shall be paid from the Settlement Fund.

Administrative Expenses with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 case, shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

## B.    Classification and Treatment of Claims and Interests

The Claims against and the Interests in the Debtor are separately classified for purposes of voting to accept or reject the Plan and for purposes of distribution. The classification and the determination of which Claimants are in each Class is determined by the requirements of section 1122 of the Bankruptcy Code which requires a plan to classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code requires that, except for the classification of certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim is "substantially similar to the other claims or interest of such class.

The Bankruptcy Code also requires that a plan of reorganization provide for the same treatment for each claim or interest or a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that they have complied with such standard. If the Bankruptcy Court finds otherwise, it could deny confirmation of the Plan if the Claimholders and Interest holders affected do not consent to the treatment afforded them under the Plan

The Plan classifies the following in separate Classes:

1. Class 1 is made up of the Claims that are given priority by the Bankruptcy Code that are not tax claims owed to governmental agencies. Class 1 is not Impaired by the Plan. Class 1 Priority Claims shall be paid in full on the Effective Date.

2. Class 2 is made up of Claims that are in the amount of $500.00 or less. These claims are all Claims that would otherwise be classified as Class 7 Unsecured Claims that are for $500.00 or less, or for more than $500.00 if the holder of the Claim has elected, on the Ballot provided for voting on the Plan within the time fixed by the Court and returning such Ballot, to accept $500.00 in full satisfaction, discharge and release of such Claim. Class 2 Claims are not Impaired. Class 2 Administrative Convenience Class Claims shall be paid in full from the Settlement Fund thirty (30) days after the Effective date.

3.    Class 3 consists of the Secured Claim of Textron Financial Corporation in the approximate amount of $7,493,537.68. The Textron Secured Claim is secured by substantially all of the Debtor's assets. The Class 3 Secured Claim of Textron Financial Corporation shall remain unaltered except as mutually agreed between the Debtor and Textron Financial Corporation and shall be paid in full in accordance with the terms of the loan and security documents. Textron Financial Corporation shall retain its pre-petition security interest.

4.    Class 4 consists of the Secured Claim of CFSC Consortium Group in the approximate amount of $382,966.20. The CFSC Secured Claim is secured by a Mortgage in a first priority position on the land and building on Unit #38 located in Hurricane, Utah. The Class 4 Secured Claim of CFSC Consortium Group shall remain unaltered and shall be paid in full in accordance with the terms of the loan and security documents. CFSC Consortium Group shall retain its pre-petition security interest.

5.    Class 5 consists of the Secured Claim of Regency Savings Bank in the approximate amount of $89,213.82. The Secured Claim of Regency Savings Bank is secured by a Deed of Trust in a first priority position on the land and building on Unit # 116 located in Kingman, Arizona. **.** The Class 5 Secured Claim of Regency Savings Bank shall remain unaltered and shall be paid in full in accordance with the terms of the loan and security documents. Regency Savings Bank shall retain its pre-petition security interest.

6.    Class 6 consists of the claims of those entitled to be paid retirement benefits pursuant to the terms of JB's Executive Retirement Plan. The amount of these claims based on actuarial tables is approximately $1,700,000. The Debtor shall pay Class 6 claims in full. Debtor shall restart the monthly payment obligations pursuant to the terms of the Executive Retirement Plan on the first day of the next full month following the Effective Date. Debtor shall calculate the amount owing and unpaid to the Claimants on the Debtor's Executive Retirement Plan, without interest, and shall make additional payments to those Claimants entitled to payments in 24 equal installments over the year following the Effective Date.

7.    Class 7 consists of the Allowed  Unsecured Claims and all Claims not otherwise classified. These claims are in the approximate amount of $4,000,000. The Debtor shall pay Class 7 claims in full. Debtor shall pay quarterly payments commencing on the first Business Day of first full month of the next full quarter following the Effective Date and on the first Business Day of each quarter thereafter, for a period of five years from the Effective Date. (That is, hypothetically, if the Effective Date is February 10, the first quarterly payment would be made on April 1, if it is a Business Day and on the first Business Day of each quarter thereafter.) The amount owing shall not accrue interest. Debtor shall calculate the total amount owing to Class 7 and shall divide the total amount owing by twenty (20). Each quarterly payment shall be in the amount that is 1/20th of the total amount owing and shall be paid pro-rata to the Claimants in Class 7.

Debtor may decide to allow Claimants in Class 7 have an election to participate in the Settlement Fund in lieu of the quarterly payments over time. Class 7 creditors may make the election in the ballot filed with the court prior to the Confirmation of this Plan. Creditors that make the election to participate in the Settlement Fund in lieu of the quarterly payments shall receive their pro-rata share of the monies remaining in the Settlement Fund after payment of Administrative Expenses, Administrative Convenience Claims, Priority Tax Claims, and Priority Claims, up to, but not exceeding, the total amount of their Allowed Unsecured Claim without interest. Payments shall be made to Class 7 Claimants who make the election thirty (30) days after the Effective Date. Any Class 7 Claimant who makes the election agrees to accept the amount received from the Settlement Fund as full and complete payment of the amount owing on their Allowed Claim.

8.  Class 8 consists of all equity interests represented by the shares of stock in the Debtor. Class 8 shall retain its shares in the Debtor.

## C.  Distributions to Creditors

The Plan sets forth a number of provisions regarding when and how distributions will be made to Claimants, the filing by the Debtor of objections to claims and the impact of such objections on distributions, the settlement of disputed claims, and the disallowance of Post Petition additions to Claims for interest and professional fees.  The Plan should be reviewed carefully at Article IX for important information regarding distributions to Creditors

## D.  Settlement Fund and Election by Unsecured Creditors to Participate

Debtor may determine to allow Claimants in Class 7 have an election to participate in the Settlement Fund in lieu of the quarterly payments over time.  Class 7 creditors may make the election in the ballot filed with the court prior to the Confirmation of this Plan.  Creditors that make the election to participate in the Settlement Fund in lieu of the quarterly payments shall receive their pro-rata share of the monies remaining in the Settlement Fund after payment of Administrative Expenses, Administrative Convenience Claims, Priority Tax Claims, and Priority Claims, up to, but not exceeding, the total amount of their Allowed Unsecured Claim without interest.  Payments shall be made to Class 7 Claimants who make the election thirty (30) days after the Effective Date.  Any Class 7 Claimant who makes the election agrees to accept the amount received from the Settlement Fund as full and complete payment of the amount owing on their Allowed Claim.

## E.  Creation of Settlement Fund

On or before the Effective Date, the Debtor shall create the Settlement Fund by placing the sum of $2,500,000.00 in a segregated interest-bearing account with the financial institution it is then using. Debtor may fund the Settlement Fund from whatever sources available including, but not limited to, from the sale or sales and leaseback of its real property, from secured or unsecured loans from third parties, or from its Shareholder.  Any monies not necessary to fulfill the Plan's obligations to make payments from the Settlement Fund, the remaining monies shall be repaid to the Debtor's  operating accounts and can be used by the Debtor for its business operation.

## F.  Executory Contracts

Many of the Debtors Executory Contracts have been assumed and many more will be assumed by the Court in the Confirmation Order.  A list of Executory Contracts which shows which have been assumed, which have been rejected, and which the Debtor intends to assume or reject in the Confirmation Order is attached hereto as Exhibit B.

The Confirmation Order shall provide for the assumption of all Franchise Agreements with Debtor's Franchisees as those agreements may be modified through negotiations with the Franchisees.   The Modified Franchise Agreements are attached to the Plan as Exhibit B.

The Plan provides that the Debtor will Cure any defaults on the Executory Contracts or unexpired leases upon Assumption.  However, the Plan provides that all defaults  shall be deemed cured except to the extent written demand for the cure of or demonstration of ability to cure any default has been filed with the Bankruptcy Court and served upon Debtor by the non-Debtor party to such Executory Contract or unexpired lease within thirty (30) days after the date of service of notice of the Effective Date.  In the absence of a timely demand in accordance with the foregoing, Debtor's obligation to cure or demonstrate the ability to cure shall be deemed waived, released and discharged.

If any non-Debtor party to an Executory Contract or unexpired lease timely serves and files a written demand, and Debtor files an objection in writing to such demand within thirty (30) days thereafter, any

monetary amounts by which each Executory Contract to be assumed pursuant to the Plan is in default, shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of the Debtor to provide "adequate assurance of future performance" or (c) any other matter pertaining to assumption, the dispute will be brought before the Bankruptcy Court and Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption. The Bankruptcy Court shall, by the issuance of a Final Order, determine the amount actually due and owing in respect of such demand or shall approve the settlement of such demand. Debtor shall have thirty (30) days thereafter in which to effect such Cure or withdraw ab initio their assumption of such Executory Contract or unexpired lease whereupon such Executory Contract or unexpired lease shall be deemed to have been rejected as of the date of the Chapter 11 petition for relief.

The Plan provides that if the rejection of an Executory Contract or unexpired lease results in damages to the other party or parties to such contract or lease, a Claim for such damages is barred unless the a proof of Claim is timely filed. The Claim shall be forever barred and shall not be enforceable unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor as follows: (a) if the Claim arises from the rejection of an Executory Contract or unexpired lease by operation of any provision of this Plan, thirty (30) days after the date of service of notice of the Effective Date; (b) if the Claim arises from the rejection of an Executory Contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court (other than the Confirmation Order) authorizing rejection of such contract or lease, thirty (30) days after service of notice of the entry of such Final Order; or (c) if the Claim arises from the rejection of an Executory Contract or unexpired lease that is rejected after withdrawal of the assumption thereof, thirty (30) days after service of notice of the assumption withdrawal. The foregoing applies only to Claims arising from the rejection of an Executory Contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a proof of Claim filed by earlier applicable bar dates.

All Allowed Claims arising from the assumption of an Executory Contract or unexpired lease shall be treated as a Class 7 Unsecured Claim unless otherwise ordered by Final Order of the Bankruptcy Court.

## VII
## VOTING ON THE PLAN

### A.      Who May Vote

Each Impaired Class of Claims or Interest that is likely to receive or retain any interest in property under the Plan shall be entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan. By operation of law, each class that will receive nothing under the Plan is deemed to have rejected the Plan. Classes 6 and 7 are entitled to vote on the Plan. Only creditors and equity interest holders whose claims and interests have been both **allowed** for purposes of voting and **impaired** by the Plan are entitled to vote on the Plan.

For a claim to be allowed for voting purposes, the claim must be listed in the Debtor's Chapter 11 schedules **and** must **not** be listed as "disputed", "contingent" or "unliquidated". If a claim is listed but shown as "disputed", "contingent" or "unliquidated", the holder of the claim will not be entitled to vote absent the timely filing of a proof of claim.

If a claim is not listed or is listed as "disputed", "contingent", or "unliquidated", the holder of the claim must file a proof of claim on or before the bar date set by the Court (or the Debtor must file a proof of claim for that creditor as permitted by the Federal Rules of Bankruptcy Procedure) for that creditor to be entitled to vote. Moreover, no holder of a claim will be entitled to vote if any party in interest objects to that claim before balloting on the Plan or any Amended Plan occurs, unless the Bankruptcy Court enters a specific order allowing the claim for voting purposes.

For an equity interest to be allowed, the equity interest holder's asserted interest must appear in the Debtor's schedules or the holder of the equity interest must file a proof of interest before the bar date set by the Court (or the Debtor must do so for the interest holder as permitted by the Federal Rules of Bankruptcy Procedure), and the equity interest holder must be a record holder of the Debtor's securities on the date of the order approving this Disclosure Statement is entered on the Court's docket. In addition, no entity claiming to hold an equity interest may vote if any party in interest has objected to the allowance of the asserted interest prior to voting on the Plan or any Amended Plan, unless the Bankruptcy Court enters an order allowing the interest for voting purposes.

In addition to the foregoing criteria for voting eligibility, only creditors and equity interest holders whose claims or interests are "impaired" by the Plan (i.e., those whose claims or interests are altered or who will not receive the allowed amount of their claims in cash pursuant to the original terms of their agreements) are entitled to vote to accept or reject the Plan. Holders of claims or interests which are not "impaired" are deemed to have accepted the Plan as a matter of law.

If the claim or interest you hold has been classified in one of the impaired classes of claims or interests created by the Plan, it is important that you vote. In addition, if you hold more than one claim or interest classified as "impaired" under the Plan, it is important that you vote with respect to **each** such claim or interest. **IF YOU FAIL TO VOTE, YOUR RIGHTS MAY BE JEOPARDIZED**.

**B.      Voting Procedures**

After carefully reviewing this Disclosure Statement and its Exhibits, vote to accept or reject the Plan on the enclosed ballot (or ballots) and mail or deliver it (or them) to the addresses identified below so that your ballot (or ballots) are received by the voting deadline..

Under the Bankruptcy, for purposes of determining whether the Requisite Acceptances have been received, only holders of Impaired Claims who actually vote by delivering a duly executed Ballot prior to the Voting Deadline will be counted. All ballots must be signed and received prior to the deadline set forth by the Court in the accompanying Order approving this Disclosure Statement.

Mail or deliver original ballots to:

Clerk, U.S. Bankruptcy Court
District of Arizona
2929 N. Central Avenue
Phoenix, Arizona  85004

Also, mail or deliver copies of all ballots to the Debtor's attorney at the following address:

Thomas E. Littler
1411 North Third Street.
Phoenix, Arizona 85004

AS MAIL DELAYS MAY OCCUR, IT IS IMPORTANT THAT THE BALLOT OR BALLOTS BE MAILED OR DELIVERED **WELL IN ADVANCE** OF THE BAR DATE SPECIFIED. BALLOTS RECEIVED AFTER THIS DATE MAY NOT BE COUNTED.

Each creditor entitled to vote is to receive a ballot for each separately classified, impaired claim held. Each equity interest holder entitled to vote is also to receive a ballot. If you believe that you are entitled to vote on the Plan and you have not received this Disclosure Statement along with the Exhibits, a Ballot and related materials, you may request them from Counsel for the Debtors at the address shown above. These documents are also available on the JB's web site located at warnickelittler.com.

If you do not receive the required number of ballots, with your copy of the Court-approved disclosure statement, notify the proponents attorneys immediately at the address noted above.

**IT IS IMPORTANT FOR YOU TO CAST ALL BALLOTS WHICH YOU ARE**
**ENTITLED TO VOTE.**

**C.     Voting Deadline**

The Voting Deadline for the return of the ballots has been set by the Court as _____.

**In order to be counted, ballots must be appropriately completed, personally signed and received by the Clerk of the Bankruptcy Court and Debtors Counsel no later than the Voting Deadline.**

Except to the extent requested by the Debtors, or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, Ballots received after the Voting Deadline will not be counted or otherwise used in connection with the Debtor's request for Confirmation of the Plan.

**D.     Vote Required for Class Acceptance**

A class of claims accepts the Plan if the Claimholders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) who vote to accept the Plan hold at least two-thirds (2/3) in dollar amount and constitute more than one-half (1/2) in number of the allowed claims in the class **actually voting** on the Plan. A class of equity interests accepts the Plan if it is accepted by those who hold at least two-thirds (2/3) of the allowed interests in the class **actually voting** on the Plan.

**E.     Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, unless otherwise determined by Debtors, must submit proper evidence satisfactory to Debtors of authority to so act.

**F.     Defects and Irregularities**

All questions as to the validity, form, eligibility (including the time of the receipt), acceptance, and revocation or withdrawal of Ballots and/or withdrawals will be determined by the Debtor in its sole discretion, which determination shall be final and binding. The Debtors reserve the absolute right to reject any and all Ballots or withdrawals not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel be unlawful. The Debtors further reserve the right to waive any defects or irregularities of conditions of delivery as to any particular Ballot or withdrawal. The interpretation by the Debtors will be final and binding on all parties. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots or withdrawals, nor will any of them incur any liability for the failure to provide such notification.

**G.     Withdraw of Ballots: Revocation**

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Debtor at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim to which it relates and the aggregate principal amount represented by such Claim, (ii) be signed by the withdrawing party as the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim and possesses the right to withdraw the vote sought to be

withdrawn, and (iv) be received by the Debtor in a timely manner at the addresses set forth in this Disclosure Statement.

## H.     Further Information

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material received, or if you wish additional materials, you may go to the Debtor's web site at warnickelittler.com or call or write Thomas E. Littler at (602) 256-0400 or at the address written above.

## VIII
## CONFIRMATION OF THE PLAN

## A.     Confirmation Hearing

The Bankruptcy Court has scheduled the Confirmation hearing for _____ at _____m. The Confirmation hearing may be adjourned from time to time by the Bankruptcy Court with further notice except for announcement made at the hearing or any adjourned hearing.

## B.     Objections to Confirmation of the Plan

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of the Plan, regardless of whether it is entitled to vote.  The Bankruptcy Court has directed that, any written objections to the Confirmation of the Plan must be filed with the Bankruptcy Court and served upon Counsel for the Debtor and other parties in interest.  Objections to Confirmation of the Plan must: (i) be in writing, (ii) comply with the Bankruptcy Code and Bankruptcy Rules, (iii) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against the Debtor, and (iv) state with particularity the legal and factual bases for the objection.  Objections to the Plan are governed by Bankruptcy Rule 9014.

**Objections to Confirmation that are not timely filed and served may not be considered by the Bankruptcy Court and may be overruled solely on the basis that it was untimely.**

**Parties with objections are encouraged to contact Debtor's counsel to attempt to negotiate resolution prior to filing an objection to Confirmation.**

## C.     Requirements for Confirmation of the Plan

At the Confirmation hearing, the Court will determine whether the Plan satisfies the requirements for Confirmation listed in § 1129(a) of the Bankruptcy Code.   If the Court determines that those requirements are satisfied, it will enter a confirmation order.   The requirements of § 1129(a) of the Bankruptcy Code are:

1.   The Plan complies with the applicable provisions of this title;

2.   The Debtor has complied with the applicable provisions of this title;

3.   The Plan has been proposed in good faith and not by any means forbidden by law;

4.   Any payment made or to be made by the by the Debtor, or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5. (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and (ii) the appointment to, or continuance in, such office of such individual, is consistent with interests of creditors and equity security holders and with public policy; and (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

6. With respect to each Class of Claims or Interests, each Impaired Creditor and Impaired Interest holder either has accepted the Plan or will receive or retain under the Plan on account of the Claims or Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. See Section "Best Interests Test/Liquidation Under Chapter 7;"

7. The Plan provides that Administrative Claims and other Priority Claims will be paid in full on the Initial Distribution Date or such later date as they are due by their own terms, except to the extent that the holder of any such Claim has agreed to a different treatment;

8. At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such class;

9. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

10. The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to Bankruptcy Code Section 1114(e)(1)(B) or 1114(g), at any time prior to confirmation of the Plan for the duration of the period the Debtor has obligated itself to provide such benefits. The Debtor does not have any such retiree benefits.

The Debtor believes that, upon receipt of the Requisite Acceptances by at least one Class of Impaired Creditors, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.

**D.    Feasibility of the Plan**

Bankruptcy Code section 1129(a)(11) requires that the Bankruptcy Court find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation is proposed in the Plan. Since Debtor's Plan provides for the payment of Administrative Expenses and Priority Claims on or shortly after the Effective Date, and the payment of Unsecured Classes over a period of years, Debtor must show the Court that it has or can obtain the required monies and that future operations will generate sufficient monies to pay operating expenses with enough left over to fulfill the ongoing obligations in the Plan.

As of the date of this Disclosure Statement Debtor has $_____ in unreserved cash that can be used for the payment of the Plan obligations at or shortly after the Effective Date. Debtor is going to raise the remaining monies needed, plus an additional sum to fund the $2,500,000.00 Settlement Fund, by the sale and leaseback of some of its owned real property.

Debtor also believes that with its closing of money losing operations, the reduction of operating expenses, and the elimination of some burdensome lease expenses, that it will be able to generate sufficient

moneys to pay the obligations of Classes 6 and 7 over the period of five years after Confirmation. Debtor has prepared a spreadsheet showing the anticipated revenues that can be used to pay the Post Confirmation obligations of Classes 6 and 7.

The amount the Debtor will have to pay on the Post Confirmation obligations to Class 7 can not be determined until all the elections made by Claimants in Class 7 have been tallied and calculated. Because of that uncertainty, Debtor will show that it can make the required payments to Classes 6 and 7 under the Plan even if no Class member in Class 7 makes the election to participate in the Settlement Fund. A spreadsheet showing the Debtors projected income for the next five years is attached as Exhibit E.

### E. Confirmation without Acceptance of All Impaired Classes "Cramdown"

Notwithstanding the rejection of any class of the Plan, the Court may still confirm the Plan if, as to each Impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable".

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting Impaired Class is treated equally with respect to other classes with equal priority or legal rights.

"Fair and equitable" has different meanings for secured claims, unsecured claims and interests.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if the plan provides (a) that each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) but no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of equity interests that rejects the Plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interest of the rejecting Class will receive or retain under the Plan any property on account of such junior interest.

The Debtor believes that the treatment under the Plan of the holders of Claims and Interests in such Classes will satisfy the "fair and equitable" test because all Claims shall be paid in full unless that Claimholder elects to compromise its claim by participation in the Settlement Fund. In addition, the Debtor does not believe that the Plan unfairly discriminates against any dissenting Class because all dissenting Classes of equal rank are treated equally under the Plan.

In the event that one or more classes of impaired Claims reject the Plan, the Court will determine at the Confirmation hearing whether the Plan is fair and equitable with respect to and does not discriminate unfairly against, any rejecting impaired Class Of Claims.

### F. Alternatives to Confirmation and Consummation of the Plan

The Debtor's believe that the Plan affords holders of Claims the potential for the greatest realization on their allowed Claims and on the Debtor's assets and, therefore, is in the best interest of such holders. If, nevertheless, the necessary Acceptances of the Debtor's Plan are not received, or if the necessary acceptances are received and the Plan is nevertheless not Confirmed and consummated, the theoretical alternatives include formation of an alternate plan or plans of reorganization or the liquidation of the Debtor under Chapter 7 or Chapter 11 of the Bankruptcy Court.

### 1. Continued Operations and Delay in the Process

Debtors goal by Confirmation of the Plan is to quickly emerge from Chapter 11 with a minimal of Administrative Expense while giving Creditors the option of taking a cash settlement now in an as yet undetermined amount that may result in a compromised amount, or receiving payment of the full amount of their Claim over a period of five years. If this Plan is not Confirmed, no matter what happens thereafter, there will inevitably be delay in the Bankruptcy process, will undoubtedly increase the amount of Administrative Expenses especially the fees and expenses of professionals, and will result in delay in payment to Creditors and most likely a smaller payment on their Claims.

**2.      Alternative Plans**

If the necessary Acceptances are not received or if the Plan is not Confirmed, the Debtors or other parties in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation. Debtor has evaluated various reorganization strategies and has explored various alternatives in connection with the formulation and development of a Plan. The Debtors believe that the Plan as proposed provides the greatest and most likely opportunity for Creditors to get paid the greatest recovery on their claims.

**3.      Liquidation Under Chapter 7/ Best Interest Test**

Even if the Plan is accepted by each Class of holders of Impaired Claims, the Bankruptcy Court must find that the Plan is in the "best interest" of all holders of Claims that are Impaired by the Plan and that have not accepted the Plan. The so-called "best interest" test, set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an impaired class of claims have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with property of a value, as of the Effective Date, that is not less than the amount that such holder will receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on that date.

To calculate the probable distribution to members of each impaired class of claims if a debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee

This liquidation value would be distributed based on statutory priorities (i.e., no junior class of claims may be paid anything unless all classes of claims senior to such junior class are paid in full). Bankruptcy Code Section 510(a) provides that subordination agreements are enforceable in bankruptcy cases to the same extent that they are enforceable under applicable non-bankruptcy law. Therefore, no class of claims that is contractually subordinated to another class would receive any payment on account of its claims, unless all senior classes are paid in full. It is, therefore, exceedingly unlikely that Subordinated Creditors could receive anything in the event of a conversion.

The Debtor believes that under the Plan all holders of Impaired Claims and Impaired Interests will receive property with a value not less than the value such holder would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on the following facts: 9i) Chapter 7 would substantially reduce the proceeds available for distribution to Creditors, including, but not limited to, the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and professional advisors to the trustee, (b) the erosion in value of assets in a Chapter 7 case in the context of the rapaid liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail, (c) the adverse effects on the Debtor's businesses as a result of the likely departure of key employees, (d) the substantial increases in claims, such as estimated contingent claims, which would be satisfied on a priority basis or on parity with the no priority unsecured Creditors, (e) the reduction of value associated with a Chapter 7 trustee's likely cessation of operations, and ()f) the substantial delay in distributions to the Debtor's Creditors that would likely ensue in a Chapter 7

liquidation; and (ii) the liquidation analysis prepared by the Debtor with the assistance of management which is annexed to this Disclosure Statement as Exhibit G (the "Liquidation Analysis").

The Debtor believes that any liquidation analysis is speculative, as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtor's control. Thus, there can be no assurance as to the values that would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under Bankruptcy Code Section 1129(a)(7).

For example, the Liquidation Analysis attached hereto as Exhibit G necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based on the Debtor's review of their books and records and the Claims filed in the Chapter 11 Case and its estimation of the Claims that might arise in the event of a conversion of the case from Chapter 11 to Chapter 7. The Bankruptcy Court has not estimated or fixed the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

To the extent that confirmation of the Plan requires the establishment of amounts for the Chapter 7 liquidation value of the Debtor, funds available to pay Claims, and the reorganization value of the Debtor, the Bankruptcy Court will determine those amounts at the Confirmation Hearing. Accordingly, the annexed Liquidation Analysis is provided solely to disclose to holders the effects of a hypothetical Chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.

If no plan is confirmed, the Chapter 11 Case may be converted to a case under Chapter 7. In Chapter 7 a trustee would be elected or appointed to liquidate the Debtor's assets for distribution to Creditors in accordance with the priorities set by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtor. The Debtor believes, however, that the distributions to each Creditor in Chapter 7 would be less than or equal to the distributions they would receive under the Plan

**G.    Modifications and Amendments**

The Debtor may alter, amend, or modify the Plan or any Exhibits thereto under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to "substantial consummation" of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtor may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims or Interests under the Plan; *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**H.    Effects of Confirmation**

**1.    Binding Effect**

From and after the Effective Date, the Plan will be binding upon and insure to the benefit of the Debtor, all present and former holders of Claims against and Interests in the Debtor, whether or not such holders will receive or retain any property or interest in property under the Plan, their respective successors and assigns.

### 2. Permanent Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims against, or Interests in, the Debtor will be permanently enjoined, on and after the Effective Date, from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the property of the Estate or the proceeds of such property, including without limitation property transferred to the Buyer (except with respect to liabilities expressly assumed by the Buyer) or the Plan Trust, of any kind against the property or interests in such property while it remains in the Estate or the Plan Trust, on account of any such Claim or Interest, (iii) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest, and (iv) asserting any Claim or Interest against Buyer other than Claims directly related to the assumed liabilities or rights under the Executory Contracts that are assigned to the Buyer.

### 3. Exculpation and Limitation on Liability

Neither the Debtor, nor any of its respective present or former members, officers, directors, employees, advisors, attorneys, or agents, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the sale of the Debtor's assets pursuant to the Asset Purchase Agreement, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate or of the Plan or the property to be distributed under the Plan, and in all respects they shall be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Debtor, or any of its respective present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of the Chapter 112 Cases, the sale of the Debtors assets pursuant to the Asset Purchase Agreement, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate or of the Plan or the property to be distributed under the Plan, and in all respects they shall be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

## IX
## CERTAIN RISK FACTORS RELATING TO THE PLAN

Holders of Impaired Claims who are entitled to vote on the Plan should carefully consider the following risk factors before deciding whether to vote to accept or to reject the Plan.

### A. Failure to Confirm the Plan

Even if the Requisite Acceptances are received, the Bankruptcy Court may choose not to confirm the Plan. Although the Debtor believes that the Plan should be confirmed, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B. Failure to Consummate the Plan

Certain conditions must be satisfied in order for the Plan to become effective and for the sale pursuant to the Asset Purchase Agreement to be consummated. Unless such conditions are fully satisfied, or waived in accordance with the applicable provisions of the Plan, the Bankruptcy Code, the transactions contemplated in the Plan will not be consummated, and the Plan will not become effective.

Although the Debtor believes that each such condition can be satisfied, the ability to satisfy certain of the conditions is dependent on rulings by the Bankruptcy Court which are favorable to the Debtor. Furthermore, while the Debtor has well supported arguments for its position with respect to he issues to be decided by the Bankruptcy Court and believes in good faith that it can prevail with respect to the requested rulings, the outcome of any particular ruling cannot be guaranteed.

Moreover, Debtor must accumulate sufficient monies to pay Administrative Expenses and classes with payments due on the Effective Date or negotiate alternative payment arrangements. Raising sufficient monies may be dependent on secured creditors releasing collateral and Debtor selling or selling and leasing back sufficient assets to meet their obligations.

Debtor's ability to fund the Settlement Fund in a sufficient amount to allow Class 7 Creditors to make an election to be paid a cash payment on the Effective Date is completely dependent on Textron's willingness to release collateral.

Since this plan provides for payments over a period of time out of future operating income, performance under the Plan is dependent on the future success of the Debtor's business operations. While Debtor believes in the future success of the business is likely and that it can meet its forecast of future income, such is dependent on numerous factors and by its nature uncertain.

# X
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.     Federal Income Tax Consequences to the Debtor**

Debtor does not believe that implementation of the Plan will generate significant taxes payable by the Debtor's Estate. Only if creditors elect to participate in the Settlement Fund and are not paid the Allowed amount of their claim will there be any cancellation of debt income. Any such income, however, shall be offset by Debtor's net loss carry forward.

**B.     Federal Income Tax Consequences to the Holders of Claims**

The tax impact of the consummation of the Plan on Claim Holders and Interest Holders will depend on their individual tax circumstances, including without limitation their basis in the Claims or Interests they hold. The Debtor cannot provide such holders with tax advice. Each holder should consult with its own tax professional.

# XI
## RECCOMENDATION AND CONCLUSION

The Debtor recommends that all creditors and equity interest holders entitled to do so vote to accept the Plan because the Plan provides the best presently available alternative for a financial return. If the Plan is not approved, the Debtor would continue to seek other rehabilitative alternatives, but a liquidation having the consequences discussed previously might ensue.

If all impaired classes of claims and equity interests vote to accept the Plan, the Debtor could save substantial resources which it might otherwise have to use to obtain confirmation over the objection of an impaired class. For this and the other reasons noted, the Debtor urges you to vote to accept the Plan.

RESPECTFULLY SUBMITTED this 8th day of July, 2002.

WARNICKE & LITTLER, P.L.C.


By_____
       Ronald E. Warnicke
       Thomas E. Littler
       1411 N. Third Street
       Phoenix, Arizona 85004
       Attorneys for Debtor